Guardian Bancorporation, Defendant in Error, v. Chicago Title & Trust Company, Executor, and Tillie Ulmer, Executrix of the Last Will and Testament of James A. Low, Deceased, Plaintiffs in Error.

Gen. No. 36,128.

256

Opinion filed April 11, 1933.

EUGENE W. ROGERS and EDWARD J. KELLEY, for plaintiffs in error.

POMEROY & MARTIN and BENNETT & COLBACH, for defendant in error.

MR. PRESIDING JUSTICE SCANLAN delivered the opinion of the court.

This was an action in assumpsit upon a promissory note in the sum of $37,625. The original defendant was James A. Low. The case was tried, judgment entered, and this writ of error sued out during the lifetime of Low. Thereafter Low died and in this court his death has been suggested and the cause has proceeded in the name of his executors. In the lower court there was a jury trial and at the conclusion of all the evidence, upon motion of plaintiff, the court directed a verdict in favor of plaintiff for $34,098.75.

Plaintiff sued to recover upon a note for $37,625, signed by Low, dated December 31, 1926, and payable to Guardian National Bank, which had been reduced by payments, hereafter explained, in the sum of $3,401.25. On September 27, 1930, Guardian National Bank consolidated with Union Bank of Chicago and all of the assets of the former bank that were not then turned over to the latter bank were turned over to plaintiff corporation that was then formed, and the

stock of the latter corporation was issued to the stockholders of Guardian National Bank, and Low, as a stockholder of Guardian National Bank, became a stockholder in plaintiff corporation.

Plaintiff alleges that it became the owner of the note "both by the said The Guardian National Bank having transferred and delivered the same to the plaintiff for good and valuable consideration, and in and by reason of the same having been heretofore endorsed by the said The Guardian National Bank of Chicago to the Guardian Bancorporation, plaintiff in this action." The defense interposed in the affidavit of merits is want of consideration, that a prior, or original, note in the sum of $45,000 was executed by Low "as an accommodation to the Guardian National Bank," and that Low "renewed said note as an accommodation to said Guardian National Bank from time to time, the last renewal being on January 4, 1927."

In December, 1924, Guardian National Bank was in process of organization and directors had been chosen to act for it when organized. Low was one of them. On December 26, 1924, all of the capital stock had been subscribed, at $125 a share, but $200,000 of the subscriptions had not been paid, which situation, if unchanged, would necessarily delay the contemplated opening of the bank on January 2, 1925. Henry R. Kent had been chosen to act as president of the new bank. On December 26, 1924, 14 of the "directors" executed and signed the following written agreement:

"This Memorandum of Agreement, made and entered this 26th day of December, 1924, by and between Henry R. Kent, party of the first part, Stephen H. Bridges, party of the second part, Allan O. Allshul, Thomas Brisch, Clarence B. Chadwick, G. Frank Croissant, Thomas J. Forschner, Charles M. Hayes, Jacob L. Kesner, James A. Low, Fred A. Hackman, E. C. Tourje, Emil E. Rose and Samuel B. Wechsler, parties

of the third part, all of the City of Chicago, County of Cook and State of Illinois, Witnesseth That:

"Whereas all of the parties hereto are directors of the Guardian National Bank of Chicago, a National bank now in the process of organization, consisting of ten thousand shares of a par value of One Hundred Dollars each, and

"Whereas all of said stock has been subscribed at the price of One Hundred Twenty-five Dollars a share, making à total of One Million, Two Hundred Thousand Dollars,

"Whereas only One Million Dollars has been paid on said subscriptions, leaving a balance of Two Hundred Thousand Dollars approximately to be collected, and

"Whereas it is deemed advisable to open said bank, as per schedule, on the 2nd day of January, 1925, and in order to secure the charter so to do, it is necessary to raise immediately said sum of Two Hundred Thousand Dollars, and

"Whereas the party of the second part, Stephen H. Bridges, for the purpose of aiding in the raising of said money, has offered to lend, on trust receipt, to the party of the first part, Henry R. Kent, Two Hundred Thousand Dollars par value securities of the United States Government for a period of time not exceeding twenty days, and

"Whereas said party of the first part has agreed to pledge his individual credit, backed by the security of said bonds belonging to the party of the second part in order to immediately raise the money needed, and

"Whereas, the parties of the third part and the party of the first part, individually, severally desire to indemnify the party of the second part against any loss, cost or damage whatsoever (except his proportionate share as one of the fourteen parties hereto.

"Now, Therefore, in consideration of the premises, and one dollar and other good and valuable considerations, each to the other in hand paid, the receipt of which is hereby acknowledged, it is mutually covenanted and agreed by and between the parties hereto as follows:

"1. The party of the second part hereby deposits with the party of the first part Two Hundred Thousand Dollars face value securities of the United States Government, in trust nevertheless for the uses and purposes as set forth in Paragraph 2 hereof.

"2. The party of the first part hereby accepts said Two Hundred Thousand Dollars face value United States Government securities in trust for the specific purpose of hypothecating same as collateral to his individual note and borrowing thereon Two Hundred Thousand Dollars for the specific purpose of paying same to the Guardian National Bank, in process of organization, so that the full total of said bank capital may be had in order to obtain the chàrter. Said loan, to be made by the party of the first part, shall be with one of the reputable banks of Chicago or some other satisfactory party, and shall be for a period of not longer than to and including January Fifteenth, Nineteen Hundred and Twenty-five. No commission shall be paid therefor—only bank interest rates.

"3. It is mutually agreed by and between the parties hereto that any and all moneys received after the date hereof on stock subscriptions to the Guardian National Bank, shall be applied against said loan, and upon the full re-payment of said loan and the taking down of said collateral, said collateral shall be returned to the party of the second part.

"4. The twelve parties of the third part, each for himself, severally, and the party of the first part on his own behalf, agree to indemnify and hold harmless the said party of the second part, each for one-four-

teenth of any loss, cost or damage of whatsoever kind or nature which the party of the second part may sustain by reason of his having deposited said bonds of a face value of Two Hundred Thousand Dollars hereunder to aid in the organization of the said Guardian National Bank.

"5. Two of the directors, Edward G. Blonder and Darby A. Day have not joined in this agreement, having been absent. If their consent hereto is obtained and their signatures affixed, it shall reduce the liability of each director to one-sixteenth each. And in the event only one of said Two absent directors consent hereto, the respective liability of each director shall be one-fifteenth.

"This agreement shall be binding upon and inure to the benefit of the heirs, executors, administrators and assigns of the respective parties hereto.

"For convenience, this document may be signed by the several parties of the third part on various copies hereof, in which event such signature or signatures shall be as binding as if all of the parties of the third part had signed on this original.

"In Witness Whereof the parties hereto have hereunto affixed their hands and seals the day and year first above written."

Low was one of the signers of the above instrument.

After the making of this agreement Kent borrowed from Bank of Montreal, *upon his personal note,* $200,000, which he turned over to Guardian National Bank, thus enabling the new bank to open. In securing this loan Kent put up bonds which belonged to Bridges, as collateral. Low was one of the organizers of Guardian National Bank and he subscribed for 100 shares of the capital stock, for which he paid $125 a share. Kent undertook to collect from various subscribers for stock the amounts they owed for the same, and as a result of his efforts in that regard his note to Bank of Montreal was reduced to $45,000 by October, 1925. On

October 30, 1925, Low executed his promissory note to Guardian National Bank for $45,000, and to secure the payment of the same he put up with the bank as collateral sundry bonds owned by him. The bank then credited $45,000 to Low's account and he, on the same day, drew his check on that account, payable to Kent, for $45,000, and the latter used the same in paying the balance due on his note at Bank of Montreal. Kent then received from the latter bank the collateral and returned it to Bridges. Kent testified that at the time that Low signed the note he (Kent) told him that the 360 shares of capital stock which had been issued by the bank but which had not been paid for would be held as Low's and also as security for his note, and as fast as payments were made on the stock or the stock was sold they would be credited on his note. Low did not contradict this testimony. He testified that he made the original note and put up the collateral for the same at the request of Kent and that he never expected to pay the same; that he signed the original note because Kent asked him to and told him that the bank would be getting the benefit of it and he (Kent) would take care of the interest. On cross-examination he stated that the original $45,000 note "represented 360 shares at $125 a share"; "that is, the $45,000 note represented 360 shares at $125 a share"; that the difference between the first note and the second renewal note, for $37,625, was due to the fact that 60 of the shares "were sold by the directors' syndicate . . . and the sale of those shares was endorsed on his note"; that he subsequently took over 300 or 302 shares. "Q. And thereafter you continued to hold that stock and you have it today, have you not? A. Yes, sir. Q. And you voted that stock, did you not, at various times as the owner of it? A. I wouldn't say that I did. I signed the proxies in blank if I remember right. Q. Well, I have got a lot of proxies here with your signature, I believe. (Handing papers to witness.) Is

that your signature? A. Yes, sir." (Witness here identified various proxies signed by him.) Low then testified that in 1926 he received and receipted for the stock that had been reissued to him and that he indorsed the same on the back "so it could be sold and delivered," and that he left the stock at the bank until he received it from Murphy in 1929, at which time Low insisted that all of the shares should be delivered to him. Just before the present suit was commenced against him, after the claim had been placed in the hands of a lawyer for collection, he offered to return the certificates to plaintiff. On the same date that Low gave his check to Kent, October 30, 1925, Kent wrote Low the following letter:

"Mr. James A. Low,

"25 N. Dearborn St., Chicago.

"Dear Mr. Low:

"I am enclosing herewith a memorandum of the various securities which you deposited today as collateral to your demand note for $45,000, and for which you have on this date issued your check to my order. Said amount is to be used for the purpose of taking up a loan of $45,000 now carried with the Bank of Montreal, which amount represents the unpaid portion of the Directors' syndicate, which was formed just prior to the opening of the bank; and which is secured by collateral loaned to us by Mr. Stephen H. Bridges, —which collateral, on the payment of said $45,000 to the Bank of Montreal is to be delivered to Mr. Bridges and his receipt taken therefor.

"The loan which was made to you today represents the unpaid subscriptions for 360 shares of Guardian National Bank stock. Said subscriptions are to be collected from the original subscribers, or sold to new stockholders. The proceeds of the sale of this 360 shares are to be applied as part payment of your note of $45,000 as the sales are made and money received,

and on which transaction I accept the responsibility of acting as your agent or trustee in the liquidation of said note. And further, I assume the responsibility of paying all interest accruing from time to time on said loan, until the same is fully liquidated, in the same manner as I have previously done on the loan made with the Bank of Montreal on the security furnished by Mr. Bridges.

"Every effort is to be made to dispose of this 360 shares of bank stock at as early a date as possible; and when your demand note for $45,000 given today to the Guardian National Bank is liquidated in full through the above method, the collateral deposited as security thereto is to be returned in the same condition as when received, with the exception of possibly such payments as may have been made on the collateral during the period it is held by the Guardian National Bank.

"Very truly yours,
"H. R. Kent."

"HRK:H

Thereafter Kent continued to make collections upon the unpaid subscriptions and apply them upon Low's note, and Kent paid the bank the interest due upon the note. On August 31, 1926, the principal had been reduced to $37,625. On that date Low gave his renewal note to Guardian National Bank for that amount, with the same collateral as security. On December 31, 1926, 300 shares of the capital stock which had been issued by the bank to several individuals but which had not been paid for by them, were turned over to Low, at his request, and they were then reissued to him, and during the years 1927, 1928, 1929 and 1930 he gave five different proxies to vote these shares at various meetings of stockholders held during those years. On January 24, 1927, Low renewed his note to Guardian National Bank for $37,625, upon the same collateral, the new note, which is the one sued upon, bearing date

December 31, 1926. Low left the certificates representing the 300 shares of stock with a vice president of Guardian National Bank, and the latter kept them until December, 1928, or the early part of 1929, when he gave them to Low at the request of the latter. ''The bank was going at that time.'' Low still had the certificates at the time of the trial. About February, 1929, Kent retired as president of the bank and Andrew T. Murphy became its president. The latter then found that part of Low's collateral consisted of second mortgages, and he thereupon called Low's attention to that fact and asked him ''to substitute either first mortgage collateral or some other acceptable form of collateral, which he did.'' At that time Low was still a director of the bank and a member of its finance committee. Murphy testified that ''in midsummer of 1930'' he told Low that he would have to pay the note so that the assets of the corporation could be liquidated and the stockholders paid, and that Low said ''he didn't have the cash to pay the note in full and hoped he would be given sufficient time to turn around. I stated there wouldn't be any attempt at immediate collection measures, that all that the Guardian Bancorporation wanted was to get the note in line for payment. He stated at that time that he had some property at Flossmoor that he expected to sell and that that would be used as an initial payment for the note. I told him that it would be perfectly satisfactory to pay the note as and when he could within a reasonable length of time.'' Low denied making these statements to Murphy.

We find it somewhat difficult to follow the argument of plaintiffs in error. At the beginning of their brief they state that ''the errors relied upon for reversal are: . . . (omitting certain other alleged errors) The Municipal Court erred in excluding certain evidence offered in behalf of defendant. The Municipal Court erred in limiting the examination of witnesses

by counsel for defendant. The Municipal Court erred in admitting certain evidence in behalf of plaintiff, over the objection of defendant's counsel. The Municipal Court erred in fixing the amount of the bond at $40,000, when the evidence of plaintiff's witnesses showed that plaintiff held collateral of the defendant to the amount of $40,000, and the court in view of that fact should have fixed nothing but a cost bond, the amount of which should not have been in excess of $200.'' The first three points were abandoned. In fact, we find no reference thereafter made to any of them. As to the last point, plaintiffs in error have seen fit to argue that the trial judge was unfair in fixing the appeal bond at $40,000, but we are unable to see how this argument can aid us in determining the instant *writ of error.*

The sole defense interposed in the affidavit of merits is that no consideration passed from plaintiff to Guardian National Bank and that the note was ''an accommodation to the Guardian National Bank.'' As the trial court instructed the jury to find for the plaintiff, the sole question is, Did the defendant make out a *prima facie* case as to the defense interposed. Our conclusion is, after a careful study of all the evidence, that the defendant failed in that regard and that the trial court was justified in instructing the jury to find for the plaintiff. The material facts necessary to be considered in the determination of the question of failure of consideration are not disputed. Low was an officer and organizer of the bank and he was entirely familiar with the Kent-Bridges arrangement and was one of the signers of the agreement of December 26, 1924, and as one of the signers he was bound by certain of its provisions. He knew on October 30, 1925, that Kent's note at Bank of Montreal had been reduced from $200,000 to a balance of $45,000, and that the Bridges collateral was still held by that bank, and on

that date he gave his note for $45,000 to Guardian National Bank and deposited certain collateral, that he owned, to secure it, and on the same date the bank credited his account with a deposit of $45,000 and he immediately drew his check upon that bank, payable to Kent, for $45,000, which check was honored by that bank. On the same day Kent wrote to Low the letter to which we have heretofore referred, which throws a flood of light upon the entire transaction. On the same date 360 shares of capital stock of the bank became the property of Low, of which he still held 300 shares at the time of the trial. During the years 1927, 1928, 1929 and 1930 he exercised the right to vote these shares at the various meetings of stockholders. Guardian National Bank, according to the undisputed evidence, had nothing to do with the transaction between Kent and Low except to loan Low $45,000 on his note, secured by collateral, and to renew the same twice thereafter. Plaintiffs in error seem to avoid certain material facts that bear upon the question as to whether or not there was a failure of consideration, but they strenuously argue that Low, in all he did, was governed solely by a desire to benefit the bank and its depositors, and that to permit the judgment to stand would be to ''sanction the mulcting of one stockholder for the benefit of others.'' They ignore the fact that the bank, at the time Low gave the first note, parted with $45,000, which has never been repaid to it, and that the sole defense interposed in the affidavit of merits is failure of consideration. Defendant's counsel stated, in the argument before the trial court, that the defendant might have a right of action against the thirteen other signers of the so-called directors' syndicate agreement, but, whether he would or would not, we fail to see how the question of alleged mulcting plays any part in the determination of this case. Nor does the argument that Low was actuated solely by a

desire to aid the bank and its depositors appeal to us. Had the bank prospered, the stock that he received would have increased in value and the transaction would have become a very profitable one to him, and he could then contend that when he made the first note, he, personally and alone, assumed, in effect, to pay the balance due upon the unpaid subscriptions and that he thereby became the sole owner of the stock, and that the other 13 signers of the agreement of December 26, 1924, were not entitled to share in any way in the stock. In the fall of 1925, when the first note was signed by Low, the first stage in the cycle of the great boom that occurred in this country was in progress. The boom ended in the fall of 1929 and the great depression then commenced, and the instant defense seems to be an outgrowth of that event.

Plaintiffs in error assert that some deceit or misrepresentation was practiced by Kent upon Low, as a result of which Low signed the original note. It is sufficient to say, in answer thereto, that even if it be conceded that there was evidence to support such assertion, nevertheless, such deceit or misrepresentation on Kent's part would not bind the bank. According to the testimony of Low and Kent, they were the sole parties concerned in the signing of the original note. The $45,000 paid by the bank upon Low's check was used in paying Kent's note at Bank of Montreal. As we have heretofore stated, Guardian National Bank had nothing to do with the transaction except to lend Low the $45,000. Notice to Kent, under the circumstances, was not notice to the bank. (See *Morris v. Thurman,* 263 Ill. App. 78; s. c., 270 Ill. App. 621 [Abst.]; *Heiple v. Boyer,* 264 Ill. App. 572, 588; *American Guaranty Co. v. State Bank of East Lynn,* 244 Ill. App. 16, 29; *Seaverns v. Presbyterian Hospital,* 173 Ill. 414, 420; *Higgins v. Lansingh,* 154 Ill. 301, 388; *Metcalf v. Draper,* 98 Ill. App. 399, 406.)

The final argument of plaintiffs in error is that "there can be no recovery herein and the judgment entered on the verdict . . . should be reversed because of the fact that no court will mulct one stockholder for the benefit of the others and not having accounted in some manner for our collateral, the burden of accounting for the same being on the plaintiff, this court has a right to presume and the trial court should have presumed that the collateral was ample to satisfy our note." No issue was raised by the pleadings nor during the trial that plaintiff had converted the collateral, nor that it was not in its possession, and after a careful examination of the transcript of the evidence we find that no demand was made by the defendant that the collateral be exhibited or accounted for, nor did the defendant question, in any way, the ability of the plaintiff to return the collateral. In fact it appears from a statement made by the trial court at the time of the decision that it was assumed that plaintiff had the collateral. Even then, counsel for defendant did not see fit to question, in any way, the possession of the collateral by plaintiff. The present contention is plainly an afterthought and raised for the first time in this court. In view of the record we would not be warranted in reversing and remanding this cause for the sole purpose of having the plaintiff exhibit the collateral. Plaintiffs in error have apt ways to protect their interest in the matter of the collateral.

There is no merit in this writ of error and the judgment of the municipal court of Chicago is affirmed.

*Affirmed.*

GRIDLEY and SULLIVAN, JJ., concur.